# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. 3:02CR334(PCD) |
| | : | |
| v. | : | |
| | : | |
| HERMAN JAMES | : | November 3, 2004 |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

On January 9, 2004, in the midst of jury selection, the defendant, Herman James, pleaded guilty to Counts One, Two, and Three of the Second Superseding Indictment in this case. Counts One and Two charge him with counterfeiting, in violation of 18 U.S.C. § 472; Count Three charges him with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Sentencing is scheduled for November 18, 2004, at 1:00 p.m. The Government respectfully submits this Memorandum in Aid of Sentencing.

## INTRODUCTION

The Probation Office prepared a Presentence Report ("PSR"), which included certain recommendations regarding the application of the Sentencing Guidelines to this case. The base offense level for Counts One and Two, which are grouped, is Level 9 under Sentencing Guidelines Section 2B5.1. See PSR at ¶ 44. This is in accord with the Guidelines calculation contained in the plea agreement. The base offense level for Count Three is Level 20, under Section 2K2.1(a)(4)(A). See PSR at ¶ 45. Because the offense level for the group comprising Counts One and Two is more than eight levels less serious than the offense level for Count Three, there is no increase for the combined offense level. See U.S.S.G. § 3D1.4(c).

- 1 -

The Probation Office has recommended a two-level upward adjustment for obstruction of justice, pursuant to Section 3C1.1 of the Guidelines.  See PSR at ¶ 49.   The Government concurs with this recommendation.  The Probation Office also recommends that the Court withhold the three-level downward adjustment for acceptance of responsibility because James falsely denied and frivolously contested relevant conduct.  See PSR at ¶ 51.   The Government agrees with the Probation Office and will not recommend to the Court a downward adjustment for acceptance of responsibility.  If the Court were to accept these recommendations (which James will vigorously contest) the final offense level would be Level 22 (Base Offense Level of 20, plus two levels for obstruction and no decrease for acceptance).  James is in Criminal History Category IV.  See PSR at ¶ 60.

In order to apply the Sentencing Guidelines in this case, the Court will have to make factual findings as to whether James obstructed justice and whether he has accepted responsibility for the offenses of conviction.  To assist the Court in its fact-finding, the Government has prepared this memorandum and exhibits, which summarize a lengthy investigation.  The Government has previously submitted to the Court, under seal, the grand jury transcripts of certain witnesses whose testimony may assist the Court in its inquiry.  In submitting these materials, the Government is well aware of the Supreme Court's decision in Blakely v. Washington, 124 S. Ct. 2531 (2004).  However, for the reasons stated at page 18, infra, the Government submits that the binding precedent in this Circuit permits, and even requires, the Court to make findings of fact in connection with sentencing.

## I.     SUMMARY OF OFFENSE CONDUCT.

In May of 2002, James, who was at that time a resident of New London, Connecticut, met Nicole Diaz.  Shortly after they met, James and Diaz began an intimate relationship and James moved into Diaz' residence, a condominium in New London, Connecticut, where Diaz was then living.  James, who had no steady job, always had large amounts of cash on hand, which he used to pay for groceries, clothing, restaurants, and numerous other household and consumer items.  Shortly after James  moved in with her, Diaz realized that he possessed and routinely passed large amounts of counterfeit United States currency.  Despite her initial misgivings about using counterfeit currency, Diaz herself began accepting counterfeit currency from James and routinely used it to pay for various household and personal expenses.  Diaz also came to realize that James was involved in drug-trafficking in and around New London.

James revealed to Diaz his methods for passing counterfeit currency.  James targeted certain establishments where he knew that the cashiers would be young and relatively inexperienced.  For example, he would frequently dine at fast-food restaurants. He would use counterfeit ten-dollar and twenty-dollar bills to pay for relatively inexpensive items, a beverage, for example, and would pocket genuine currency as change.  Before passing the counterfeit currency, James would fold, roll, and crinkle the bills in order to enhance the appearance of authenticity.  James told Diaz that he used counterfeit currency to purchase illegal drugs. Because these drug purchases were generally furtive transactions in dimly lit areas, the recipients of the counterfeit currency would be less likely to notice that they had been bilked until it was too late.  James also used counterfeit (and sometimes genuine) currency to purchase counterfeit merchandise, including watches and clothing, which he then resold.

One day towards the end of June, 2002, Diaz went into the attic of her house and found approximately six two-inch stacks of what she believed to be counterfeit currency.  The stacks were partially concealed beneath insulation.  The currency included ten-dollar bills, twenty-dollar bills, fifty-dollar bills, and hundred-dollar bills.  The stacks were bound with red rubber bands and wrapped in clear plastic.  Diaz also observed what she believed to be approximately 100 Ecstasy pills and a bag of what she believed to be powder cocaine, all of which was also partially concealed beneath insulation in the rafters or floorboards.  When Diaz confronted James about this discovery, he laughed and did not deny that he had been storing counterfeit currency in her residence.

Although James himself passed large amounts of counterfeit currency, he also routinely used Diaz to purchase items for himself and for both of them using counterfeit currency that he had given to her.  James told Diaz that this practice was more likely to succeed because Diaz had a more innocent demeanor than he did and would thus be less likely to invite the suspicion of cashiers and merchants.  James also advised Diaz that she would not be severely punished if she were arrested because she had no criminal record, whereas James would face more severe punishment if he were caught passing counterfeit currency because, as he explained to Diaz, he had a criminal record.

The conduct that gave rise to Count One occurred on July 16, 2002, which was James' birthday.  James had decided to celebrate his birthday by obtaining a pair of Timberland boots for himself at Jammin, a store at the Crystal Mall in Waterford, Connecticut, that sold hip-hop style clothing, footwear, and accessories.   According to store employees, James had previously come to this store and had been observed admiring certain articles of clothing, including Timberland

boots.  James, accompanied by Diaz, entered the store and selected the boots, which he then instructed Diaz to purchase for him.  Before entering the store, James had given Diaz counterfeit United States currency to pay for the merchandise.  James knew that the currency was counterfeit at the time he gave it to Diaz.  Diaz did, in fact, pay for the merchandise with 14 counterfeit ten-dollar bills.  As Diaz and James were leaving the store, just after Diaz had paid for the items with the counterfeit currency, the cashier and the proprietor of the store recognized the currency as counterfeit and demanded that Diaz return the merchandise, which she did.  The proprietor gave her back the 14 counterfeit ten-dollar bills.  Diaz and James returned to their car, only to realize that Diaz had left the car keys in the store's changing room.  James directed Diaz to retrieve the keys.  When Diaz returned to the store, she was met by officers of the Waterford Police Department, who had been summoned by the proprietor.  The police arrested Diaz for forgery and larceny and seized from her person a total of 27 counterfeit ten-dollar bills.  When questioned, Diaz falsely told the Waterford Police that she had received the counterfeit currency from a recent acquaintance known to her only as "Sean."  Shortly after the arrest of Diaz, the Waterford Police Department turned over the seized counterfeit currency to the Secret Service, which opened a criminal investigation on August 2, 2002.

        Later in the investigation, the proprietor of Jammin and the two store employees identified James in a photospread as the person who accompanied Diaz to the store on July 16, 2002.  They also recognized James as having previously come to the store to check out the same Timberland boots that he had attempted to purchase on July 16, 2002.  In fact, both employees remembered that approximately two weeks before the July 16 incident, James had come into the store with an unidentified white male, who attempted to buy Timberland boots for James using a

credit card issued to a person with a female name. Sensing that this was a potentially fraudulent transaction, the cashier declined to complete the transaction.

Although James was not arrested by the Waterford Police at the Crystal Mall on July 16, 2002, this incident formed the basis for Count One of the federal indictment against James, which charged him with aiding and abetting in the commission of an offense, in violation of 18 U.S.C. § 2, as well as the substantive offense of counterfeiting, in violation of 18 U.S.C. § 472.

The incident at Jammin was actually the third occasion on July 16, 2002, on which Diaz had passed counterfeit currency that James had given to her. Earlier that day, Diaz had gone to 5-Star Supermarket in New London and had passed four counterfeit ten-dollar bills to buy various groceries that she intended to use to prepare a special birthday dinner for James. Although those counterfeit bills were accepted by the supermarket cashier, they were subsequently discovered (following deposit of the day's receipts) and turned over to the Secret Service. Similarly, Diaz and James went to Timberland Retail in Westbrook on July 16, 2002, and bought a pair of Timberland boots for James using 10 counterfeit ten-dollar bills. These bills were accepted by the cashier, but were subsequently discovered among the day's receipts and turned over to the Secret Service.

On August 8, 2002, James and Diaz went to the Department of Motor Vehicles ("DMV") in Norwich, Connecticut, so that James could obtain a duplicate driver's license. Before James entered the DMV, Diaz told him not to use counterfeit currency to pay the $20 fee. Diaz knew that James was carrying a large amount of genuine currency on him and was concerned that he had become too confident in his ability to pass counterfeit. James disregarded Diaz' advice and tried to pay for the license using two counterfeit ten-dollar bills. When a clerk at the DMV

noticed that James had passed counterfeit currency, she notified her supervisor, who called the

Connecticut State Police.  The State Police arrived at the scene shortly thereafter and arrested

James.  At the time James was arrested, Diaz was waiting for him in a car outside the DMV

building.  James was charged with a state offense for his attempt to pass counterfeit currency and

he was released on bond later that day.  James' attempt to pass counterfeit currency at the DMV

gave rise to the counterfeiting offense charged in Count Two of the indictment, in violation of 18

U.S.C. § 472.

The serial numbers on the two counterfeit ten-dollar bills recovered from James at the

DMV in Norwich on August 8, 2002 match the serial numbers on some of the ten-dollar bills

seized from Diaz when she was arrested at the Crystal Mall in Waterford on July 16, 2002.

These serial numbers also matched serial numbers on some of the other counterfeit currency

recovered on July 16, 2002, from establishments in New London and Westbrook, where Diaz

admitted that she had passed counterfeit ten-dollar bills given to her by James.  See Summary of

Counterfeit Currency Recovered on July 16, 2002, attached hereto as Exhibit 1.

On August 13, 2002, Diaz sold her residence in New London.  As she and James were

moving their belongings out of the house, she observed James to be in possession of two

handguns, which she had not seen before.  Diaz and James, along with one of James's friends,

Lacey Scott (a.k.a. "Lace"), then took up temporary residence in a suite at the Norwich Inn &

Spa, a resort hotel in Norwich, Connecticut.  While they were staying at the Norwich Inn & Spa,

Diaz observed James possessing and handling the two guns that he had taken from her residence

on August 13, 2002.  On August 18, 2002, Diaz, James, and Lace, moved into another suite at

the resort.  A maid cleaning the suite that they had just vacated discovered several items that the

- 7 -

trio had left behind, including a .32 caliber Arminius revolver, bearing serial number 100066. The maid also found a jacket and a VCR player. The maid informed the hotel manager, who immediately summoned the Norwich police. When the police arrived, they interviewed James, who claimed ownership of the jacket and the VCR player, but denied knowing anything about the gun. James falsely stated that the gun must have been left by the previous guest in that room. When told that the room had been thoroughly cleaned and checked before Diaz, James, and Scott had moved in, James falsely stated that the gun had probably been left there by one of several friends who had visited him in the room. Questioned separately by the police, Diaz falsely stated that she had no knowledge of the gun. Diaz also told police, truthfully, that she and James had not had any visitors since they arrived at the hotel. James was arrested and charged with a state offense relating to his possession of the gun. This incident gave rise to the firearms offense charged in Count Three of the indictment, charging James with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

After his release on bond, James found out that Diaz had unwittingly given the police a statement that was inconsistent with his statement, which led to his arrest. As a result, he became enraged and beat her up. Diaz had always understood that she should cover for James in encounters with law enforcement; James' savage reaction on this occasion merely underscored this reality.

From July 16, 2002, through August 18, 2002, then, James participated in several state and federal criminal offenses involving firearms and counterfeit currency, two of which resulted in his arrest by state authorities. On August 30, 2002, James and Diaz went to the State's Attorney's Office at the state courthouse in Norwich, where they met with Assistant State's

Attorney David Smith in connection with the pending gun charge against James. This is a routine practice in State court, intended to allow a defendant an opportunity to persuade the prosecutor that the charges against him should be dismissed or, at the least, reduced. The State's case against James was circumstantial and there were no fingerprints on the gun; in light of these circumstances, James believed that he could persuade Smith to drop the charge.

Smith first met privately with James, while Diaz waited outside his office. Smith advised James of his rights and then inquired as to the circumstances of the incident that led to his arrest. James stated that the gun was not his, but did not say whose gun it was. James told Smith that Diaz would also say that it was not his gun. When Smith stated that he wanted to talk to Diaz privately, James indicated that he wanted to stay in the office while Smith interviewed Diaz. Despite James' repeated request to be present while Smith interviewed Diaz, Smith told James that he would only meet privately with Diaz and that James should wait in the Main Lobby of the courthouse. James did not wait in the Main Lobby, but in the vestibule of the State's Attorney's Office. Smith could see James looking in the large plate glass window to his office, trying to observe Diaz. James appeared agitated as he watched and waited for Diaz. Diaz knew that James was outside the office and appeared to be nervous as she gave a statement to Smith. Fearful that if she inculpated James he would assault her again, Diaz falsely told Smith that the gun belonged to James' friend, who was staying with them and whom she falsely identified as Parrish Raines. It was James who induced Diaz to make this false exculpatory statement. In any event, Smith did not believe her and did not dismiss the gun charge based on her false exculpatory statement.

Following this incident, James became increasingly suspicious of Diaz and concerned that she would cooperate with law enforcement authorities in connection with the pending criminal charges against him. He was also concerned that investigators would make a connection (through common serial numbers) between the counterfeit currency recovered at the Crystal Mall from Diaz on July 16, 2002, and the counterfeit currency he had attempted to pass on at the DMV on August 8, 2002. He warned Diaz on various occasions not to cooperate with law enforcement. James also became increasingly abusive toward Diaz in August and September of 2002, physically striking her on various occasions and threatening her on other occasions. In late September, 2002, Diaz was contacted by Special Agents of the United States Secret Service, who were investigating the July 16, 2002, counterfeiting incident at Jammin, described above. Diaz revealed James' role in her own arrest on July 16, 2002, as well as James' counterfeiting activity over the previous four months. She also disclosed that she had observed James in possession of the gun that was recovered at the Norwich Inn & Spa on August 18, 2002.

As part of her informal cooperation with the Secret Service, Diaz agreed to ask James for counterfeit currency, which she would then turn over to the Secret Service. When Diaz did ask for counterfeit currency from James on November 4, 2002, he became suspicious of her motives. He had previously warned her not to cooperate with law enforcement authorities in connection with the gun possession and counterfeiting charges, and had previously threatened her with physical violence if she did cooperate. In the early morning hours of November 4, 2002, James expressly told Diaz, "If I find out you snitched on me, I will f___king kill you." James left Diaz with a jacket and indicated that he wanted to meet with her later that day. See Statement of Nicole Diaz, attached hereto as Exhibit 2. When Diaz did not meet with him, James became

- 10 -

enraged.  Sensing that Diaz could not be relied upon to cover for his criminal offenses, he left a series of five menacing messages on Diaz' voice mail, in which he threatened her and her parents with physical harm if she did not return his jacket.  Although ostensibly about a borrowed jacket, the messages were actually an expression of frustration by James that he was losing control of Diaz and an attempt to intimidate her.  These voice mail messages reflect James' anger, desperation, and hostility.  Enclosed herewith as Exhibits 3 and 3A are a compact disk containing recordings of these five messages, along with a transcription of the messages.  Although the messages do not in themselves contain any explicit references to Diaz's prospective cooperation with law enforcement authorities, the messages were left by James several hours after he had threatened to kill Diaz if she "snitched."  In this context, it is clear that these voice mail messages were intended to intimidate Diaz so as to hinder, delay, and prevent her from cooperating with law enforcement authorities.  In any event, Diaz understood James to be threatening her in order to deter her from contacting law enforcement authorities regarding his various criminal activities.

Based in large part on information provided by Diaz, the Secret Service obtained a criminal complaint and arrest warrant for James on October 30, 2002.  The complaint was supported by a sworn affidavit, which included significant inculpatory information that had been provided by Diaz.  The affidavit, which was filed under seal, identified Diaz only as "CW-1." Following his arrest on the federal arrest warrant on November 14, 2002, James was lodged at the Wyatt Detention Facility in Central Falls, Rhode Island.  His cellmate was Mark Manns, who had been arrested by the FBI in June of 2002 for aiding and abetting a bank robbery in Woonsocket, Rhode Island.  Manns has a long criminal record, including multiple felony

convictions.  Over the course of the next four weeks, James and Manns developed a rapport, and talked at length about their respective criminal cases.

On November 21, 2002, a federal grand jury returned a three-count indictment against James, charging him with counterfeiting (two counts) and illegal gun possession.  Following his arraignment on December 4, 2002, James had an opportunity to review the arrest warrant affidavit, which had been unsealed at that proceeding and disclosed for the first time to James and his attorney.  James understood that "CW-1" was in fact Diaz, and that she had provided the Secret Service with the information to establish probable cause to arrest him for the three federal offenses charged in the indictment.  The affidavit also suggested that the Government's case rested in large part on the testimony of Diaz.

James concluded that if he could get Diaz to change or recant her testimony, his legal problems would be solved because the Government would be unable to prove its case.  James told Manns that Diaz was the only person who could incriminate him on the counterfeiting and gun charges.  Shortly after December 4, 2002, James solicited Manns to arrange for somebody outside the facility to intimidate or assault Diaz, in return for a payment of $2,000.  The purpose of the proposed intimidation/assault was to prevent Diaz from testifying against James or to induce her to change her testimony so as not to incriminate James.  Alternatively, James proposed to Manns that he make arrangements for somebody outside the facility to assault Diaz' eight-year old son, in the event that Diaz could not be located.  James expressed to Manns his belief that either assaulting Diaz or breaking her son's arm would provide the necessary disincentive to Diaz' prospective trial testimony.  James accurately described Diaz' physical appearance to Manns, who had never seen her before, and told Manns where Diaz and her son

- 12 -

could be found.  In the course of their discussions from December 4 to December 14, 2002,

Manns told James that he would try to make the necessary arrangements for an associate outside

the Wyatt Detention Facility to confront Diaz.  Manns went so far as to ask a relative then

residing in New York to go to New London for the purpose of confronting Diaz.

Although Manns was at first amenable to the plan, insofar as it involved verbal

intimidation of Diaz, he had a change of heart, occasioned, at least in part, by his reluctance to

participate in a conspiracy to commit a violent physical assault on Diaz and, especially, her eight-

year old son.  Manns was also concerned that another inmate who had been solicited by James to

arrange the assault on Diaz or her son, one Marvin Span, would disclose the scheme to law

enforcement authorities, thereby implicating Manns in a conspiracy to obstruct justice.  By letter

dated December 14, 2002, Manns directed his attorney, Edward C. Roy, to contact Special Agent

Stuart Coller of the United States Secret Service in New Haven, Connecticut (who had

previously been identified by James as the case agent in the pending federal prosecution) and to

convey to Special Agent Coller another letter, dated December 15, 2002.  In this letter, Manns

alerted Special Agent Coller to James' efforts to obstruct justice by assaulting and/or intimidating

Diaz.  Manns had had no previous contact with Special Agent Coller and had no way of knowing

of his connection to this case but for James's disclosure of that information to him.  Attorney

Roy received both letters on December 16, 2002, and immediately faxed them to Special Agent

Coller in New Haven.

On December 18, 2002, federal authorities met with Manns and Attorney Roy at the

United States Marshals Service in Providence.  In the course of a two-hour debriefing, Manns

disclosed numerous accurate details regarding James' background and his pending federal and

state criminal cases, as well as details relating to the proposed assault on Diaz or her son. Enclosed herewith as Exhibits 4 and 4A are copies of Manns' letters to Attorney Roy and Special Agent Coller, dated December 14 and December 15, 2002, respectively.

During the period of time that they were cellmates at Wyatt (from on or about November 14, 2002 through on or about January 30, 2003), James disclosed to Manns numerous details relating to the state and federal charges then pending against him, including the following items:

1.    James had learned counterfeiting during a previous term of federal incarceration, at FCI McKean (the Bureau of Prisons confirmed that James had served a term of imprisonment at FCI McKean following his 1995 conviction for possession of a firearm by a convicted felon in the United States District Court for the Southern District of New York).

2.    James had made counterfeit currency using a portable laptop computer and paper that he took from the offices of his attorneys.  He would produce large amounts of counterfeit currency ($10,000 to $20,000) at a time and would wrap the currency in plastic.  James stated that Diaz had found his stash of counterfeit currency in the attic of her house.

3.    James had passed large amounts of counterfeit currency throughout the period of time he was involved with Diaz.

4.    James had used Diaz to pass counterfeit currency because people would not suspect her.  Also, James stated that even if she got caught passing counterfeit, she would not be subject to serious penalties because she had no criminal record, whereas he did have a record and would be subject to serious penalties if he got caught passing counterfeit.

5.      Diaz used the counterfeit currency that James gave to her to rent cars and to purchase consumer items, including Timberland boots, which he selected and directed her to buy for him.

6.      The gun recovered at the Norwich Inn & Spa belonged to James and he had put it underneath the sofa cushion where the maid found it; he had intended to retrieve it but the maid got there first. James stated that he had bought the gun in the Bronx, New York, and used it for protection because he had drugs and expensive clothing with him.

7.      James knew that there would be no fingerprints on the gun because it was his practice to wipe his fingerprints off his guns so that law enforcement could not connect the guns to him.

8.      In July of 2002, James had attempted to buy a winter jacket at a store in New Haven using counterfeit currency; however, when the proprietor noticed the counterfeit currency he became angry at James. The proprietor became so irate that he, James, almost brandished his firearm.

9.      James used counterfeit currency to buy drugs from drug dealers and carried a gun for protection in these situations.

10.      James had been with Diaz at Jammin in the Crystal Mall in July of 2002, when she got arrested for passing counterfeit currency. He stated that he had picked out Timberland boots for himself, but that Diaz got caught when the cashier noticed that she was attempting to pay with counterfeit currency. James stated that Diaz was arrested after she returned to the store to retrieve the car keys. James stated that he sometimes used the name "Sean" as an alias to avoid disclosing his true identity.

11.   James was arrested at the DMV for trying to pass counterfeit currency.

12.   James had used intimidation and threats to maintain control over Diaz, and had previously assaulted her.

James' solicitation of Manns and Span to assault Diaz or her son were not his only attempts to obstruct justice in this case. According to Manns, James also tried to induce him and at least one other prisoner, Span, to harass and intimidate Special Agent Coller so as to derail Special Agent Coller's vigorous investigation of the case. James suggested to Manns and Span various ways of carrying out this assignment, including: making harassing and threatening anonymous telephone calls to Special Agent Coller; putting a bullet in Special Agent Coller's mailbox; and pouring blood on the windshield of Special Agent Coller's vehicle. Of course, the latter two methods of intimidation would require the assistance of associates outside of Wyatt. According to Span, James offered Span $300 to make a harassing and threatening telephone call. Records from Wyatt do, in fact, reflect that Span received $100 around this period of time, though the source of that money is not clear from the records. Manns did not take up James on the offer. It is not known whether Span attempted to call Special Agent Coller; in any event, Special Agent Coller did not receive any such telephone call. Enclosed herewith as Exhibit 5 is a copy of a letter received by Special Agent Coller from Span, dated January 29, 2003, disclosing James' efforts to harass and intimidate Special Agent Coller.

On April 16, 2003, the grand jury returned a five-count Superseding Indictment against James, charging him with two counts of witness tampering, in violation of 18 U.S.C. § 1512(b), in addition to the three original counterfeiting and gun charges. James' threat to kill Diaz on November 4, 2002, was the basis for Count Four of the Superseding Indictment. James'

solicitation of Manns to assault Diaz or her son, made at various times between December 4, 2002, and December 14, 2002, was the basis for Count Five of the Superseding Indictment. The grand jury returned a Second Superseding Indictment on November 21, 2003. The Second Superseding Indictment did not allege any further offenses by James, but rather included more details as to the offenses alleged in Counts Four and Five of the Superseding Indictment.

<u>James' Telephone Calls From Prison</u>

The Government was prepared to offer at trial certain telephone conversations that James had with friends and family members while he was in prison, which reveal his consciousness of guilt and his intention to obstruct justice. These calls, which have been disclosed to defense counsel, include the following:

1.  *December 5, 2002.* James admits to his father that he was involved in the charged offenses and agrees with his father that he brought these problems on himself.

2.  *January 18, 2003.* James asks a friend to confront Diaz and tell her to recant her prospective testimony.

3.  *February 18, 2003.* James tells a friend that he heard "through sources" that Diaz would recant her statements to law enforcement authorities.

4.  *March 7, 2003.* James expresses to his brother his frustration at his situation, *i.e.*, being in jail again. He states that "the gun really goes off crazy and I'll end up just killing somebody, you know what I mean?" Later in the conversation, James states: "I don't want to talk reckless on the phone, man, but I really have an itchy finger, man. I never, you know what I'm saying? I'm just trying to hold it back for, for a minute now, you see what I'm saying, because I ain't wanna, you know,

end up being on somewhere I ain't wanna be, you know, America's Most Wanted or something, you know."

5.   *March 9, 2003.*  James tells a friend ("Jamaica Dave") that Diaz (whom he refers to as "Shorty") is "going against the grain" (*i.e.*, she is cooperating with law enforcement authorities against him).  James wants Jamaica Dave to contact his nephew, Lace (*i.e.*, Lacey Scott) so that Lace can make a statement to James' lawyer, "but not to the D.A." regarding the gun that was found at the Norwich Inn & Spa.  The result of this prospective statement to James' lawyer would be that "nobody can do no time."

Enclosed herewith as Exhibits 6 and 6A are a CD containing excerpts from these recorded conversations and transcripts of the recordings.

## II.    JAMES OBSTRUCTED JUSTICE.

A.    *Blakely* Does Not Preclude Judicial Fact-finding.

Although the Supreme Court's decision in Blakely v. Washington, 124 S. Ct. 2531 (2004), has cast some doubt on the constitutionality of the United States Sentencing Guidelines, the Second Circuit has ruled that a Guidelines factor that is "unrelated to a sentence above a statutory maximum or statutory minimum, [as established by Congress] may be determined by a sentencing judge and need not be submitted to a jury." United States v. Garcia, 240 F.3d 180, 184 (2d Cir. 2001). See also United States v. Thomas, 274 F.3d 655, 664 (2d Cir.) (en banc) cert. denied, 531 U.S. 1069 (2001) (same).  In United States v. Mincey, 380 F.3d 102, 106 (2d Cir. 2004), the Second Circuit rejected a defendant's challenge to judicial fact-finding under the Sentencing Guidelines, stating that "[u]nless and until the Supreme Court rules otherwise, the

- 18 -

law in this Circuit remains as stated in Garcia, Thomas, and our other related case law." In light of the Second Circuit's holding in Mincey, this Court should make such findings of fact as are necessary to impose a Guidelines sentence, including all relevant adjustments.

      B.      Section 3C1.1 Requires a Two-Level Enhancement For Obstruction of Justice.

The Probation Office concluded that James obstructed justice; accordingly, the Probation Office has recommended a two-level upward adjustment under Section 3C1.1 of the Guidelines. See PSR at ¶ 49. James denies that he obstructed justice and has indicated through counsel that he will vigorously contest the obstruction enhancement. The Government agrees with the Probation Office's recommendation.

Section 3C1.1 of the Sentencing Guidelines permits a court to enhance a defendant's sentence for obstructing or attempting to obstruct the administration of justice during the course of the investigation, prosecution, or sentencing of the offense of conviction. See U.S.S.G. § 3C1.1 and Application Note 1. This enhancement must "be granted if the court finds that the defendant willfully and materially impeded the search for justice in the instant offense." United States v. Zagari, 111 F.3d 307, 328 (2d Cir. 1997). The Government must prove disputed factual allegations that bear on sentencing by a preponderance of the evidence. See United States v. Shonubi, 998 F.2d 84, 87 (2d Cir. 1993). "A sentencing court's resulting factual findings may be disturbed on appeal only when they are clearly erroneous. But whether the facts found . . . constitute obstruction of justice is a question of law subject to de novo review." Id. (citations omitted). If a sentencing court finds that a defendant obstructed justice, the Sentencing Guidelines require that the defendant's offense level be increased by two levels pursuant to U.S.S.G. § 3C1.1. See Hall v. United States, 46 F.3d 855, 859 (8th Cir. 1995) (holding that

district court did not have discretion to refuse obstruction enhancement if court were to find that defendant had threatened a witness).

C.    <u>Specific Acts of Obstruction or Attempted Obstruction of Justice.</u>

The Government submits and intends to prove at sentencing that there are at least six discrete instances in which James tried to obstruct justice.  These are:

1.    On August 30, 2002, when James falsely told Assistant State's Attorney David Smith that the gun found at the Norwich Inn & Spa did not belong to him and induced Diaz to make a false statement to Assistant State's Attorney Smith in order to exculpate himself.

2.    On or about November 4, 2002, when James told Diaz "If I find out you snitched on me, I will f___king kill you."

3.    On or about December 4 to 14, 2002, when James solicited Manns and Span to arrange for an assault on Diaz in order to coerce Diaz to recant the inculpatory information she had provided to the Government in this prosecution.

4.    On or about December 4 to 14, 2002, when James solicited Manns and Span to arrange for an assault on Diaz' eight-year old son in order to coerce Diaz to recant the inculpatory information she had provided to the Government in this prosecution.

5.    In December, 2002 and January, 2003, when James solicited Manns and Span to harass and threaten Special Agent Coller by making harassing and threatening anonymous telephone calls to him; by putting a bullet in

Special Agent Coller's mailbox; and by pouring blood on the windshield of Special Agent Coller's vehicle.

6.  On January 18, 2003, when James asked one of his friends by telephone to confront Diaz and tell her to recant her statements to federal law enforcement officers.

D.  The Obstruction Enhancement Applies in Each Instance.

The evidence shows that James obstructed or attempted to obstruct justice by means of witness intimidation, suborning perjury, and providing materially false information to law enforcement officers. The obstruction enhancement is appropriate with respect to each of the instances of obstructive conduct listed above.

The first instance of obstructive conduct concerns James' attempt to deceive Assistant State's Attorney David Smith on August 30, 2002, by lying and inducing Diaz to lie about his possession of a firearm at the Norwich Inn & Spa on August 18, 2002. This was the same firearm that James was charged with possessing in Count Three of the Second Superseding Indictment, to which he pleaded guilty. By lying to the Assistant State's Attorney and inducing Diaz to lie, James sought to have the state firearms charge against him dismissed. James was also well aware that his possession of a firearm constituted a federal offense, having previously been prosecuted and convicted in the United States District Court for the Southern District of New York for possession of a firearm by a convicted felon. It is clear that the mere act of telling a witness to lie to authorities constitutes obstruction of justice. See, e.g., United States v. Wade, 931 F.2d 300, 306 (5th Cir. 1991) (affirming upward departure for obstruction of justice where defendant "discussed with coconspirators false statements to tell the authorities . . . ."

It should also be noted that had James not entered a plea of guilty on January 9, 2004, Diaz would have been one of the Government's principal witnesses in the instant case. Her false statement to the Assistant State's Attorney would undoubtedly have been raised by defense counsel on cross-examination and would have been used to attack her credibility not only as to Count Three, but for the other counts as well. Thus, James' obstructive conduct on August 30, 2002, would have had a direct affect on the federal prosecution.

The fact that James' obstructive conduct occurred in the context of a state rather than a federal investigation is of no moment for purposes of the Section 3C1.1 enhancement. Courts of Appeals that have considered the issue have held that obstructive conduct in state criminal proceedings can provide a basis for the obstruction enhancement in a federal prosecution of the same underlying offense. For example, in United States v. Lato, 934 F.2d 1080 (9th Cir. 1991), the Ninth Circuit affirmed the obstruction enhancement in a federal fraud prosecution where, prior to federal action, the defendant had attempted to obstruct an earlier state investigation into the same scheme. The court held that "there is no state-federal distinction for obstruction of justice," and the enhancement is not limited to acts aimed at federal authorities. Id. at 1082-1083. Accord United States v. Imenec, 193 F.3d 206, 208-209 (3d Cir. 1999) (affirming obstruction enhancement for defendant who failed to appear at state hearing and remained at large for more than three years, thus delaying federal action on the same conduct: "Enhancement is appropriate where the defendant has obstructed an investigation of the criminal conduct underlying the offense of conviction, even where the investigation was being conducted by state authorities at the time."); United States v. Self, 132 F.3d 1039, 1042-1043 (4th Cir. 1997) (agreeing with Lato and other cases holding that obstructing a state investigation qualifies for the

- 22 -

Section 3C1.1 enhancement); United States v. Smart, 41 F.3d 263, 265-266 (6th Cir. 1994)

(affirming application of enhancement for defendant who used false name to make bail and flee

after being arrested by state authorities on charges later prosecuted in federal court); United

States v. Adediran, 26 F.3d 61, 64-65 (8th Cir. 1994) (affirming application of enhancement for

failure to appear in state court after originally being charged under state law for conduct

underlying federal offense: "[T]his circuit does not prohibit obstruction enhancements in federal

prosecutions merely because state entities were involved."); United States v. Emery, 991 F.2d

907, 911-192 (1st Cir. 1993) (agreeing with Lato and affirming obstruction enhancement for

attempted escape from state authorities prior to federal investigation: "[S]o long as some official

investigation is underway at the time of the obstructive conduct, the absence of a federal

investigation is not an absolute bar to" enhancement).  Cf. United States v. Zagari, 111 F.3d at

328, 329 (enhancement may be warranted for perjury committed during a related state

investigation, if the perjury was material to the state offense); United States v. Luca, 183 F.3d

1018, 1022-1023 (9th Cir. 1999) (affirming enhancement for submitting materially false or

misleading documents during state investigation that preceded federal action on same offense,

agreeing with Zagari that "so long as the district court found that the defendant 'willfully and

materially impeded the search for justice in the instant offense,' the enhancement should apply,

even if the obstruction occurred before state rather than federal law enforcement officials."

(emphasis added by court)).  In this regard, it should be noted that the Secret Service opened its

counterfeiting investigation on August 2, 2002.

James' second act of obstruction, threatening to kill Diaz on November 4, 2002, if she

cooperated with law enforcement authorities, occurred after the Secret Service had opened its

investigation of James, but before James was aware that he was under investigation by federal authorities. At the time of this incident, Diaz was actively cooperating with the Secret Service in its investigation of James. Section 3C1.1 clearly encompasses this conduct. See U.S.S.G. § 3C1.1, Application Note 4(a) (adjustment applies to "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so."). For this Guideline to apply, the defendant need not be aware that the person he threatens is cooperating with law enforcement authorities or has been identified as a witness. See United States v. Sanchez, 35 F.3d 673, 680 (2d Cir. 1994) (affirming obstruction enhancement for defendant who threatened witness against him, even though defendant did not know that the witness was cooperating with law enforcement authorities: "A threat to a potential witness warrants a § 3C1.1 enhancement for obstruction of justice."). The fact that James' threat to kill Diaz did not deter her from cooperating with the Secret Service does not render the enhancement inapplicable. "Threatening a witness . . . leads to a section 3C1.1 enhancement regardless of whether it results in a material hindrance." United States v. Snider, 976 F.2d 1249, 1251-1252 (9th Cir. 1992). See also United States v. Johnson, 46 F.3d 636, 638 (7th Cir. 1995) ("A threat to a potential witness is sufficient to warrant an enhancement under section 3C1.1, as long as the statement was intended to threaten, intimidate or unlawfully influence that person.").

The fact that James did not know he was under federal investigation on November 4, 2002, when he threatened to kill Diaz, does not insulate him from the obstruction enhancement. "It is clear . . . that a defendant need not know that he is under investigation at the time of the obstructive conduct." United States v. Snyder, 189 F.3d 640, 648 (7th Cir. 1999). See also, United States v. Jenkins, 275 F.3d 283, 288-289 (3d Cir. 2001) (same). But see United States v.

Oppedahl, 998 F.2d 584, 585-586 (8th Cir. 1993) (relying on deterrence principles to find a defendant must be aware of an investigation to be subject to the enhancement).

James' third, fourth, fifth, and sixth acts of obstruction all involve attempts to harm, threaten, intimidate, or coerce witnesses against him. These acts clearly fall within the range of conduct encompassed by Section 3C1.1. There is no requirement in Section 3C1.1 that the defendant <u>directly</u> threaten or intimidate the witness. The Second Circuit has affirmed an obstruction enhancement where the defendant merely expressed to a co-defendant his intent to harm a witness. <u>See</u> <u>United States v. Shoulberg</u>, 895 F.2d 882, 885 (2d Cir. 1990). The Court found that this was enough to constitute an attempt to obstruct justice because the co-defendant could then have relayed that threat to the witness. <u>See</u> <u>also</u> <u>United States v. Jackson</u>, 974 F.2d 104, 106 (9th Cir. 1992) ("Where a defendant's statements can be reasonably construed as a threat, even if they are not made directly to the threatened person, the defendant has obstructed justice."). In the present case, James' repeated affirmative acts of solicitation of others to harm, threaten, intimidate, or coerce witnesses clearly warrant the obstruction enhancement.

E.    <u>Conclusion</u>

James' conduct both before and after his indictment on federal charges reveals his clear intention to obstruct the administration of justice in this case by whatever means necessary. His attempt to arrange an assault on Diaz' eight-year old son is especially heinous and is by itself sufficient to warrant the enhancement for obstruction of justice.

III.    **JAMES HAS NOT ACCEPTED RESPONSIBILITY.**

A.    Requirements for Acceptance of Responsibility.

It is well established that "a downward adjustment for acceptance of responsibility is not automatically awarded as a result of a guilty plea." United States v. Echevarria, 33 F.3d 175, 179 (2d Cir. 1994). The question of whether to give a defendant credit for acceptance of responsibility "is a factual question as to which the district court's determination should not be disturbed unless it is without foundation." United States v. Reyes, 9 F.3d 275, 280 (2d Cir. 1993). When a defendant decides to plead guilty to an offense, "the district court may require a candid and full unraveling, and need not accept lies or equivocation." Id. at 279. The court is entitled to "a credible and complete explanation, evincing remorse or contrition, for the conduct surrounding the . . . offense of conviction." Id. at 280 (internal quotations omitted). In Reyes, the defendant equivocated, "admitt[ing] only that which could not be denied under the circumstances." Id. at 281. Thus, although the defendant in that case "accepted responsibility for conduct that satisfies the bare essentials of the offense of conviction, his explanation of his conduct was, in the eyes of the district judge, 'unbelievable.'" Id. Accordingly, because a district court may conclude that an incomplete description of offense conduct on the part of the defendant is inconsistent with acceptance of responsibility, the Second Circuit affirmed the district court's denial of the two-level downward adjustment. Id. The Sentencing Guidelines state that "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason the determination of the sentencing judge is entitled to great deference on review." U.S.S.G. § 3E1.1, Application Note 5. See also United States v. Duke,

935 F.2d 161, 162 (8th Cir. 1991) ("The sentencing judge is afforded much discretion in deciding

whether or not to grant the acceptance-of-responsibility reduction.").

In determining whether a defendant qualifies for the two-level adjustment in Section

3E1.1(a), a district court may consider a variety of factors, including those set forth in

Application Note 1 to U.S.S.G. § 3E1.1.   Among these factors is whether the defendant

"truthfully admit[ted] the conduct comprising the offense(s) of conviction, and truthfully

admit[ted] or not falsely den[ied] any additional relevant conduct for which the defendant is

accountable under § 1B1.3."  U.S.S.G. § 3E1.1, Application Note 1(a).  Application Note 1(a)

continues:

> Note that a defendant is not required to volunteer, or affirmatively
> admit, relevant conduct beyond the offense of conviction in order
> to obtain a reduction under subsection (a).  A defendant may
> remain silent in respect to relevant conduct beyond the offense of
> conviction without affecting his ability to obtain a reduction under
> this subsection.  However, a defendant who falsely denies, or
> frivolously contests, relevant conduct that the court determines to
> be true has acted in a manner inconsistent with acceptance of
> responsibility.

U.S.S.G. § 3E1.1, Application Note 1(a) (emphasis added).

The Second Circuit has held that a defendant's "false denial of relevant conduct is simply

one factor among many to be weighed by a district court considering whether a downward

adjustment for acceptance of responsibility is warranted."  United States v. Ruggiero, 100 F.3d

284, 295 (2d Cir. 1996).  See also United States v. Gonzales, 12 F.3d 298, 300 (1st Cir. 1993)

("[A] court may properly consider whether a defendant who mendaciously denies relevant

conduct has acted in a manner inconsistent with accepting responsibility.").  Indeed, the Ninth

Circuit has held that "[t]he goals of the acceptance of responsibility provision would not be

fulfilled if a defendant were eligible to receive the reduction even though he falsely denied

relevant conduct." United States v. Rutledge, 28 F.3d 998, 1002 (9th Cir. 1994). Thus, although

a defendant has a Fifth Amendment right to remain silent regarding relevant conduct, "once he

relinquishes that right and falsely denies such conduct, the district court may weigh the false

denial in considering a reduction for acceptance of responsibility." Id.

Whether a defendant has accepted responsibility for his conduct hinges on a

determination of credibility by the district court. "The district court may deny a reduction under

§ 3E1.1 of the Guidelines based on a credibility determination that the defendant has not

accepted responsibility for the offense of conviction." Reyes, 9 F.3d at 280. Among the factors a

district court may consider are "a defendant's candor and remorse." Id.

Because an assessment of credibility is necessary, a sentencing court "'is in a unique

position to evaluate a defendant's acceptance of responsibility,'" and therefore its determination

whether to grant the reduction is "'entitled to great deference on review.'" United States v.

Guzman, 282 F.3d 177, 184 (2d Cir. 2002) (quoting U.S.S.G. § 3E1.1, app. note 5).

Accordingly, this Court "will not disturb the district court's factual determination regarding

whether a defendant has accepted responsibility unless it is 'without foundation.'" Id. (quoting

United States v. Austin, 17 F.3d 27, 30 (2d Cir. 1994)). See also United States v. Giwah, 84 F.3d

109, 112 (2d Cir.1996) (same).

B.    James Falsely Characterized His Role in the Counterfeiting Offenses.

James pleaded guilty to Counts One, Two, and Three of the Second Superseding

Indictment. However, his statements to the Probation Office, particularly with respect to Counts

One and Two, fall far short of the "affirmative acceptance of personal responsibility for the

offenses to which he is pleading guilty," as required by the plea agreement.  See Plea Agreement,

dated January 9, 2004, at 3.  Although the Government agreed to recommend  a three-level

reduction in James' offense level under Section 3E1.1 for acceptance of responsibility, this

recommendation, was expressly "conditioned upon the defendant's full, complete, and truthful

disclosure to the Probation Office of information requested, of the circumstances surrounding his

commission of these offenses, of his criminal history, and of his financial condition."  Id.  James'

statements to the Probation Office regarding his passing of counterfeit currency reveal that his

acceptance of responsibility has been minimal, incomplete, and untruthful:

> During his interview with the United States Probation Office, the
> defendant stated that he received the counterfeit currency that he
> was charged with from Nichol [sic] Diaz.  He stated that she
> received it from "indulging in her activities."  The defendant
> denied making the counterfeit currency, denied knowing anyone
> who made the counterfeit currency and denied learning how to
> make it while in the custody of the Bureau of Prisons.  In regards to
> the charges in which he pled guilty, he stated "I agree with the
> Stipulation."

See PSR at ¶ 42.  In light of the substantial evidence, described above, showing that it was James

himself who had produced or procured the counterfeit currency used in the offenses of conviction

and James himself who had passed such currency on numerous occasions, the Probation Office

concluded that James was frivolously contesting relevant conduct.  Accordingly, the Probation

Office did not recommend a three-level reduction under Section 3E1.1.  See PSR at ¶ 51.

The Government agrees that James is not entitled to the reduction under Section 3E1.1,

not only because he is frivolously contesting relevant conduct, but also because he failed to give

a "full, complete, and truthful disclosure to the Probation Office of . . . the circumstances

surrounding his commission of these offenses," as required by the Plea Agreement.  See Plea

- 29 -

Agreement, dated January 9, 2004, at 3. James' characterization of his own counterfeiting activity is significant in the sentencing phase for at least three reasons. First, it is demonstrably false. James' decision to lie to the Probation Officer reflects his utter lack of remorse and his contempt for the judicial process. Second, in denying his role in producing or procuring large amounts of counterfeit currency, James has tried to minimize his criminal activity to two discrete occasions, as set forth in the stipulation of offense conduct. In fact, James passed thousands of dollars of counterfeit notes on numerous occasions from May through August of 2002. This course of conduct, affirmatively denied by James, is far more serious than the two occasions that he grudgingly admitted. Finally, by stating that he had received the counterfeit currency from Diaz, James falsely inculpated her. In reality, it was James who supplied Diaz with large amounts of counterfeit currency. The evidence produced by the Government, including the grand jury testimony of eyewitnesses, shows that James' characterization of his criminal activity is false.

The Second Circuit has recognized that a presentence report is sufficient foundation to deny a reduction for acceptance of responsibility. See United States v. Zhuang, 270 F.3d 107, 110 (2d Cir. 2001) (per curiam). In this case, both the pre-sentence report and the evidence submitted by the Government, including grand jury testimony of knowledgeable witnesses, provided equally firm bases for the Court to find that James has not accepted responsibility.

     C.      James Has Not Accepted Responsibility.

This Court is entitled to "a credible and complete explanation, evincing remorse or contrition, for the conduct surrounding the . . . offense of conviction." Reyes, 9 F.3d at 280. Instead, James has lied to the Probation Office, denied or frivolously contested relevant conduct,

and falsely inculpated another person.  James has shown absolutely no remorse or contrition. The Court may take all of this into account when considering whether to grant James a downward adjustment for acceptance of responsibility.

The Court should also consider that although James pleaded guilty before trial, he did so in the midst of jury selection, approximately five days before the scheduled start of the trial.  Cf. U.S.S.G. § 3E1.1, Application Note 1(h) (court may consider "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.").  Furthermore, his stipulation of offense conduct, while sufficient for establishing a factual basis for his plea, was merely an admission of  "that which could not be denied under the circumstances."  Reyes, 9 F.3d at 281. In sum, James' guilty plea was the barest minimum admission of wrongdoing that would be acceptable to the Government for purposes of recommending an adjustment for acceptance of responsibility.  (Because prosecutors and agents was forced to prepare for what would have been a 20-witness trial, the Government received virtually no benefit, in terms of conserving resources, from James' eleventh-hour guilty plea.)  By lying to the Probation Office, however, James vitiated even this minimal expression of acceptance.

The Government is well aware that a criminal defendant need not affirmatively admit to relevant conduct or provide assistance to law enforcement authorities in order to qualify for the Section 3E1.1 adjustment.  See Austin, 17 F.3d 27.  However, this does not mean that a defendant is free to lie to the Probation Office, falsely minimize his criminal culpability, falsely inculpate another person, and frivolously contest relevant conduct, which is what James has done in this case.  See Zhuang, 270 F.3d at 110.

D.    By Pleading Guilty, James is Not Automatically Entitled to a Reduction.

James' plea of guilty does not, by itself, entitle him to an adjustment under Section 3E1.1. "A defendant who enters a guilty plea is not automatically entitled to an adjustment for acceptance of responsibility." United States v. Ortiz, 218 F.3d 107, 108 (2d Cir. 2000). Rather, that guilty plea "can be outweighed by conduct that is inconsistent with acceptance of responsibility," id., such as James' insistence that it was Diaz who provided him with counterfeit currency.

James cannot argue that by opposing the Section 3E1.1 adjustment, the Government somehow has breached its agreement to recommend credit for acceptance of responsibility. The Government expressly reserved its right in the plea agreement to argue against acceptance if James failed to make a "full, complete and truthful disclosure to the Probation Office." See Plea Agreement at 3. James' statement (denying that he made counterfeit currency, denying that he knew anyone who made counterfeit currency, and falsely accusing Diaz of providing him with the counterfeit currency) falls far short of the "candid and full unraveling" that the Guidelines require. Reyes, 9 F.3d at 279.

E.    Conclusion.

The Probation Office correctly determined that James has not accepted responsibility for his conduct. His false and self-serving version of the counterfeiting offenses vitiates his claim for a three-level downward adjustment for acceptance of responsibility under Section 3E1.1. Moreover, James has shown absolutely no trace of genuine remorse or contrition. Accordingly, the Court should not grant him a downward adjustment for acceptance of responsibility.

IV.     **ADDITIONAL CONSIDERATIONS.**

There is an additional issue of which the Court should be aware before imposing

sentence.  On August 16, 2001, James was sentenced in Superior Court in New London for

Second Degree Robbery.  He received a sentence of three years, suspended, and a five-year

conditional discharge.  The condition listed on the Order of Conditional Discharge required

James to stay out of Connecticut.  James appears to have violated that condition within a few

months, at the latest.  Certainly, by May of 2002, he was back in New London, living with Diaz,

passing counterfeit currency, and buying and selling drugs.  By August 30, 2002, a little more

than a year after his conditional discharge, he had committed a batch of new state and federal

crimes, had been arrested twice, and had lied to an Assistant State's Attorney, as set forth above.

The State's Attorney's Office for the Judicial District of New London has stated that it will not

seek an arrest warrant for James for his numerous violations of the conditional discharge if he

were to plead guilty in his federal case.  Were it not for his guilty plea in this case, James would

have faced an additional term of state imprisonment of up to three years, with no credit for time

served in federal detention.  Thus, even if James had been acquitted on all counts in the instant

prosecution, he would still have been subject to a term of incarceration of 36 months for

violating his conditional discharge, with no credit for time spent in federal pretrial custody.

V.     **IMPOSITION OF FINE.**

At the time of his arrest, James had $707 in genuine United States currency on his person.

Under Sentencing Guidelines Section 5E1.2(c)(3), the minimum fine range to which James is

exposed is $5,000 to $50,000 (assuming all contested sentencing issues resolved in defendant's

- 33 -

favor).  The Government respectfully requests that the Court's sentence include imposition of a fine of at least $707.

## CONCLUSION

This defendant's lengthy criminal record, along with the record in this case, reveals a man with a long history of criminal activity, including violent crime, gang activity, guns, drugs, and economic crimes.  See PSR at ¶¶ 53 - 62.  His numerous encounters with state and federal law enforcement over the course of more than 11 years have not curbed his inclination to criminal activity; rather, he seems to have concluded that the only thing wrong with crime is getting caught.  Accordingly, he was careful to insulate himself from direct involvement in criminal activity, where possible, by using others to commit crimes for him (e.g., Diaz, Manns, and Span).  When arrested on the federal warrant in this case, he responded not with remorse or regret for his criminal actions, but rather with several attempts to obstruct justice by soliciting others to commit a vicious assault on Diaz or her eight-year old son and to threaten and harass a federal law enforcement officer.  His pattern of deceitful conduct has continued even after his guilty plea when he lied to the Probation Office concerning the nature and circumstances of the offense to which he pleaded guilty.

Over the course of his long criminal career, James has been given numerous opportunities to reform himself.  He has spent most of the past decade on federal supervised release, on probation, under conditional discharge, or in state or federal prison.  By his own actions, however, he has proven that he is unwilling to conform his behavior to the norms of society.  In light of this, the Government submits that James is immune to rehabilitation and that the most effective deterrent to his further criminal activity is a lengthy term of imprisonment.  For the

foregoing reasons, the Government respectfully submits that the defendant should be sentenced

within the Guidelines range corresponding to Offense Level 22 (63 to 78 months).

_____                    Respectfully submitted,

                                            KEVIN J. O'CONNOR
                                            UNITED STATES ATTORNEY


                                            JOHN A. MARRELLA
                                            ASSISTANT UNITED STATES ATTORNEY
                                            Federal Bar No. CT19473
                                            157 Church Street
                                            New Haven, CT 06510
                                            Telephone: (203) 821-3700


## **CERTIFICATION**

        This is to certify that a copy of the foregoing Memorandum has been sent by U.S. Mail,

this ___ day of November, 2004, to:

Jonathan Einhorn, Esquire
412 Orange Street
New Haven, CT 06511

Mr. Brian J. Topor
United States Probation Office
United States Courthouse
450 Main Street
Hartford, CT  06103
*(without exhibits)*


                                            _____
                                            JOHN A. MARRELLA
                                            ASSISTANT UNITED STATES ATTORNEY